**Gregory DECK, as Administrator of the Estate of Jose Jesus Calderon, Deceased, Plaintiff–Appellant,**

v.

**PETER ROMEIN'S SONS, INC., Defendant–Appellee.**

No. 96–2507.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1996.

Decided March 24, 1997.

---

George E. Weaver (argued), Chicago, IL, Kennith W. Blan, Jr., Danville, IL, for plaintiff–appellant.

John D. McFetridge (argued), Manion, Devens & McFetridge, Danville, IL, for defendant–appellee.

Before CUMMINGS, HARLINGTON WOOD, JR., and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

On October 26, 1990, Jose Jesus Calderon, a migrant farm worker, was killed in an automobile accident while traveling from one

work site in rural St. Anne, Illinois to another. Gregory Deck, administrator of Calderon's estate, brought suit against Peter Romein's Sons, Inc. ("PRSI"), for whom Calderon had worked during the 1990 season, asserting survival and wrongful death claims under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA" or "the Act"), 29 U.S.C. § 1801 et seq.[1] While this action was pending in the district court, Congress amended the AWPA to provide, among other things, that "where a State workers' compensation law is applicable and coverage is provided for a migrant or seasonal agricultural worker, the workers' compensation benefits shall be the exclusive remedy" for the death or bodily injury of such a worker. Pub.L. 104–49, § 1(a), 109 Stat. 432 (1995), codified at 29 U.S.C. § 1854(d)(1). The amendment further provides that this exclusivity provision "shall apply to all cases in which a final judgment has not been entered." Id. § 1(b), 109 Stat. 432 (1995). Giving effect to this new amendment, the district court dismissed Deck's action. In a two-page Order dismissing the suit entered on May 17, 1996, the district judge noted that in a previous decision he had determined that a genuine issue of material fact existed as to whether PRSI was Calderon's employer on the day of the accident; however, in the May 17 Order the judge reasoned:

> [T]here is no need to decide this factual issue because no foreseeable result would save the case from dismissal. If [PRSI] were found to be an employer, they [sic] would be protected from liability by the Workers' Compensation exclusivity provisions of the AWPA amendments. If [PRSI] were found not to be an employer, they [sic] would be free from any liability at all under any statute—state workers' compensation or federal AWPA. Therefore, employer status, although undecided, is not relevant.

Because this Court concludes that Deck's AWPA action may proceed even if PRSI is not found to have been Calderon's employer on the day of the accident, we reverse the judgment of the district court and remand for further proceedings.

## I. BACKGROUND

The issues presented in this appeal raise purely legal questions of statutory construction concerning the AWPA's scope of coverage and the constitutionality of the recent amendments to the Act; therefore, we shall recite the facts relating to the underlying accident only summarily to provide some context for the discussion. Jose Calderon and David Lopez were migrant workers who worked in St. Anne, Illinois during the 1990 season. PRSI is a farming concern, with its principal place of business in St. Anne, specializing in gladioli and vegetables. Marion Romein ("Romein") is half-owner of PRSI. Both Calderon and Lopez were temporary employees of PRSI during the 1990 season and they resided at the barracks on Romein's farm during that season.

On the morning of October 26, 1990, Romein was out in the yard giving instructions for the day's work to Maximo Frias, who was essentially the foreman at PRSI. Frias spoke both English and Spanish and had been with PRSI for several years. Romein, who did not speak Spanish, would give instructions to Frias, who, in turn, would convey the instructions in Spanish to the workers. At about 9:00 that morning, Richard Soucie, who was half-owner of Kankakee Valley Flowers and Produce, Inc. ("Kankakee Valley"), came to Romein's farm looking for extra farmhands.[2] He was accompanied by two Kankakee Valley migrant workers, Adolpho Ramirez and Eliseo Campos. There is dispute in the record about who said what to

1. The complaint also named Kankakee Valley Flowers and Produce, Inc. and its half-owner Robert Soucie as defendants. The parties entered into settlement agreements resolving all claims against these defendants; accordingly, the district court dismissed Kankakee Valley and Soucie from this action by an Order entered April 19, 1996.

2. Kankakee Valley, which also grew and sold varieties of cut flowers, maintained its principal place of business near St. Anne and worked two leased parcels of land in St. Anne township not far from Romein's farm.

whom and where,[3] but there is no dispute that Calderon and Lopez went off to work with Soucie, riding in the back of Soucie's truck. It is also undisputed that Calderon and Lopez left with Romein's permission. As a matter of co-operation among farmers in the area, it was customary that if one farmer had workers available that were not being used on a given day, a farmer needing extra hands could call upon the farmer with excess labor to provide him with workers.

At about noon that day, Eliseo Campos drove Calderon and Lopez back to Romein's farm for lunch. Campos returned about an hour later to drive them back to work at a Kankakee Valley farm. Later that day, Soucie wanted the workers to go to another Kankakee Valley work site. He instructed Campos to follow him in a Kankakee Valley truck with Calderon and Lopez. En route, Campos lost control of the truck and rolled into a ditch. Calderon was thrown from the truck and killed. Lopez was severely injured.[4]

Deck brought this lawsuit pursuant to the AWPA's private right of action provision, which provides: "Any person aggrieved by a violation of this chapter or any regulation under this chapter by a[n] ... agricultural employer ... may file suit in any district court of the United States having jurisdiction of the parties...." 29 U.S.C. § 1854(a). Deck's second amended complaint alleged that Calderon suffered injuries caused by PRSI's intentional violations of the Act's motor vehicle safety requirements, 29 U.S.C. § 1841, and accompanying regulations, 29 C.F.R. § 500.105. Although the original complaint in this case was filed on October 22, 1991, the case was still pending over four years later when, on November 15, 1995, Congress passed Public Law 104–49, 109 Stat. 432, amending the AWPA. Thereafter, the district court granted PRSI's motion to dismiss, which was based on the newly enacted workers' compensation exclusivity provision. At issue in this appeal is whether the AWPA's private right of action provision encompasses suits by an aggrieved migrant worker against an agricultural employer that is not the worker's employer at the time of the occurrence giving rise to the suit, and whether the 1995 workers' compensation exclusivity amendment may be applied constitutionally to cases pending at the time of its enactment.

## II. ANALYSIS

*Retroactivity*

In dismissing Deck's action, the district judge reasoned, in part, that if PRSI were found to be Calderon's employer, the workers' compensation exclusivity provision in the 1995 amendments to the AWPA would bar any claims for damages under the Act. Deck does not dispute this conclusion as to the effect of the 1995 amendments; however, he maintains that the workers' compensation exclusivity provision may not, consistently with the Due Process Clause of the Fifth Amendment, be applied retroactively. Deck's contention is entirely without merit.

In the first place, Congress' power to effect a change in the law and to make that change controlling as to pending cases is beyond peradventure. As this Court has previously noted, "[t]he principle that Congress may impose new legal rules applicable in pending cases was recognized by the Supreme Court almost two hundred years ago in *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801)." *Berning v. A.G. Edwards & Sons, Inc.*, 990 F.2d 272, 277 (7th Cir.1993). In *Schooner Peggy*, Chief Justice Marshall explained:

> [I]f, subsequent to the judgment, and before the decision of the appellate court, a law intervenes and positively changes the

---

**3.** The specifics of this disputed evidence bear on the issue of whether Calderon and Lopez were, or were not, in the employ of PRSI on the day in question and whether they went off with Soucie at the direction of Romein or his agent, Frias. PRSI has maintained throughout this litigation that on the day in question, Calderon and Lopez were temporarily laid off due to a shortage of work. The district court has not decided this

factual question, and although it will be necessary to resolve it on remand, it does not affect our analysis of the issues presented in this appeal.

**4.** Although he was a party in the proceedings below, Lopez is not a party to this appeal.

rule which governs, the law must be obeyed.... [T]he court must decide according to existing laws, and if it be necessary to set aside a judgment rightful when rendered, but which cannot be affirmed, but in violation of the law, the judgment must be set aside.

5 U.S. (1 Cranch) at 110.[5] *Berning*, like *Schooner Peggy*, involved retroactive application of new law to a case pending on appeal following entry of final judgment in the court below. Of course, if a new law may be applied retroactively to a case pending on appeal, it follows, *a fortiori*, that the new law may be applied to an action—such as Deck's—which, at the time of enactment, had not even proceeded to a final judgment in the district court.

■ It is important to note that this is not a case where Congress has left us in the dark concerning its intentions as to the reach of the 1995 amendment. To the contrary, Congress stated quite clearly that the amendment "shall apply to all cases in which a final judgment has not been entered." Pub.L. 104–49, § 1(b), 109 Stat. 432. And, "where the congressional intent is clear, it governs." *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 837, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842. Thus we need not resort to judicial decision-making principles to determine Congress' intent as to whether the amendment should be given retroactive effect. Most notably, the presumption against statutory retroactivity, discussed in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229, and relied on here by Deck, has no force in the present case because Congress has made its intention clear and the presumption is nothing more than a "generally applicable rule for interpreting statutes that do not specify their temporal reach." *Id.* at 264, 114 S.Ct. at 1496. Indeed, even the Court's general articulations of the anti-retroactivity presumption express-

ly recognize that where Congressional intent in favor of retroactive application is clear, the presumption must yield. See, *e.g., id.* (" 'congressional enactments ... will not be construed to have retroactive effect unless their language requires this result' ") (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493); *Union Pacific R.R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 ("the first rule of construction is that legislation must be considered as addressed to the future, not to the past ... [and] a retrospective operation will not be given to a statute ... unless such be the unequivocal and inflexible import of the terms and the manifest intention of the legislature") (internal quotation marks omitted).

■ Recognizing that Congress explicitly intended courts to apply the 1995 AWPA workers' compensation exclusivity amendment retroactively to pending cases, our only inquiry is whether Congress' intent comports with due process. The due process standard guiding this inquiry is one of rationality; we ask simply whether retroactive application of the 1995 AWPA amendment is rationally related to a legitimate legislative purpose. See *Pension Benefit Guaranty Corporation v. R.A. Gray & Co.*, 467 U.S. 717, 730, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (retroactive economic legislation passes due process scrutiny where "the retroactive application of the legislation is itself justified by a rational legislative purpose"); *General Motors Corp. v. Romein*, 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (characterizing the standard as "a legitimate legislative purpose furthered by rational means," citing *Pension Benefit*); *United States v. Sperry Corp.*, 493 U.S. 52, 64–65, 110 S.Ct. 387, 396–397, 107 L.Ed.2d 290; *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15–18, 96 S.Ct. 2882, 2892–2894, 49 L.Ed.2d 752.[6] As the party asserting a

5. The issue in *Schooner Peggy* was whether a French vessel seized by an American ship could be condemned. The appellate court held that condemnation was proper, but while the case was pending before the Supreme Court, the United States and France entered into a convention providing for the restoration of all French "property captured, and not yet definitively condemned." 5 U.S. (1 Cranch) at 107. Thus, like

the present case, *Schooner Peggy* involved a law that by its terms applied retroactively to pending cases.

6. Furthermore, notwithstanding Deck's suggestion to the contrary, see Appellant's Brief at 37, retroactive legislation is not subject to a "heightened rationality" requirement. In *Davon Inc. v. Shalala*, 75 F.3d 1114 (7th Cir.1996), a panel of

due process violation, it is Deck's burden to show that Congress acted in an arbitrary and irrational manner by directing that the 1995 amendment be applied retroactively. *Turner Elkhorn,* 428 U.S. at 15, 96 S.Ct. at 2892 ("It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."). In this regard, Deck will not meet his burden simply by suggesting that Calderon (or his family) acted in accordance with settled expectations based on pre-amendment law. The Supreme Court has long held that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.... This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Turner Elkhorn,* 428 U.S. at 16, 96 S.Ct. at 2893 (citations omitted). With these standards in mind, we now consider the 1995 amendment.

There can be no doubt that the 1995 amendments to the AWPA were intended to legislatively override the Supreme Court's 1990 decision in *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 110 S.Ct. 1384, 108 L.Ed.2d 585. In *Adams Fruit,* the Court held that exclusivity provisions in state workers' compensation laws did not preclude migrant workers from asserting a private right of action under the Act. *Id.* at 647–648, 110 S.Ct. at 1389–1390 ("AWPA's private right of action is unaffected by the availability of remedies under state workers' compensation law"). In response to the decision in *Adams Fruit,* Congress approved legislation (at-

tached to a fiscal appropriations bill) that temporarily "reversed" *Adams Fruit* and provided that where a State workers' compensation law applies and covers migrant or seasonal workers, the workers' compensation benefits would be the exclusive remedy for death or injuries suffered by such workers. See Pub.L. 102–392 § 325(c), 106 Stat. 1728.[7] That legislation expired by its own terms on July 6, 1993. Thereafter, extensive negotiations took place within the House Committee on Economic and Educational Opportunities in order to reach the compromise legislation (H.R.1715) that ultimately became Public Law 104–49 (the 1995 amendments to the AWPA now at issue). See H.R. Report 104–875. The legislative history of the 1995 amendments explicitly attests to the fact that the amendments were designed to "reverse" *Adams Fruit.* For example, in a statement of legislative intent concerning H.R. 1715, Representative Goodling, sponsor of the bill and Chairman of the House Committee on Economic and Educational Opportunities which released it, began by noting: "Section 1 reverses the effect of the decision of the United States Supreme Court in *Adams Fruit Company, Inc. v. Barrett,* 494 U.S. 638 [110 S.Ct. 1384, 108 L.Ed.2d 585] (1990)." [8] 141 Cong.Rec. E1943 (daily ed. Oct. 13, 1995). When he initially introduced the bill, Representative Goodling remarked:

> Mr. Speaker, today, I am introducing legislation along with several of my colleagues ... which would overrule the U.S. Supreme Court's 1990 decision in *Adams Fruit Co., Inc. versus Barrett.* The implications of the *Adams Fruit* decision are quite troubling as the decision undermines the general principle of the exclusivity of workers' compensation, both in the

---

this Court examined the issue in some detail and rejected the contention that some form of heightened scrutiny must be applied to retroactive legislation. As the panel held in *Davon,* the Due Process Clause of the Fifth Amendment requires only that the retroactive application of a new law be rationally related to a legitimate governmental end. *Id.* at 1122–1123.

**7.** Although Pub.L. 102–392 was not passed until October 6, 1992, approximately two years after the *Adams Fruit* decision was issued, Congress was apparently not sleeping on the issue during that period, for a House report on the activities

of the Committee on Economic and Educational Opportunities during the 104th Congress notes that "[e]fforts had been made, on a bipartisan basis, since 1990, to reverse the effect of the Supreme Court's decision." H.R.Rep. 104–875 (1997).

**8.** Representative Goodling's statement on legislative intent was joined by the ranking member of the Committee, Representative Clay, as well as the chairman and ranking member of the Subcommittee on Workforce Protections, Representatives Ballenger and Owens, respectively.

[AWPA] context and beyond. The workers' compensation system was designed as a quid pro quo system in which employees forego the right to a tort remedy in exchange for readily accessible relief without questions of liability or contributory negligence. The *Adams Fruit* decision undercuts the bargain that both employers and employees made in participating in the workers' compensation system. By allowing a private cause of action under [AWPA], the decision opens employers up to costly litigation and open-ended liability for workplace injuries they thought they were ensuring themselves against through their payments into the workers' compensation system.

141 Cong.Rec. E1141 (daily ed. May 25, 1995) (statement of Rep. Goodling). Additionally, Representative Fred Heineman, one of many cosponsors of H.R. 1715, entered the following remarks into the Congressional Record:

Mr. Speaker, I rise in strong support of H.R. 1715.... The decision in *Adams Fruit* places agricultural employers as the only employers in America who can be sued by their employees as a result of workplace injuries even where they have provided workers' compensation. This is unfair to our farmers, especially in those States where agricultural employers are required to participate in the workers' compensation system. I am proud to say that I am a cosponsor of H.R. 1715 and strongly support this legislation. When Congress passed [the AWPA], it did not intend for it to replace the workers' compensation system.

141 Cong.Rec. E1969 (daily ed. Oct. 18, 1995). See also 141 Cong.Rec. H10091 (daily ed. Oct. 17, 1995) (statement of cosponsor Rep. Ballenger) ("H.R. 1715 would reverse the Supreme Court's ruling, which essentially permits migrant and seasonal farmworkers to seek dual remedies. Agricultural employers could be exposed to potentially enormous liability for damages, in spite of the fact that they have contributed into the workers compensation system."); 141 Cong.Rec. H10092 (daily ed. Oct. 17, 1995) (statement of cosponsor Rep. Fazio) ("The cornerstone of the bill is the reversal of the *Adams Fruit* decision,

which unfairly places agricultural employers throughout the United States in the position of being the only employers in America who can be mandated under State law to provide workers' compensation—it is mandatory in my own State of California—yet still be sued for unlimited damages in State court for the workplace injuries already compensated under the workers' compensation system."). Similarly, in introducing an identical bill in the Senate, Senator Feinstein of California remarked:

I introduce legislation that would overturn a 1990 U.S. Supreme Court decision in *Adams Fruit Co. versus Barrett* and restore workers' compensation as the exclusive remedy for loss under the Migrant and Seasonal Agricultural Worker Protection Act where a State workers' compensation law is applicable and coverage is provided.... As a result [of *Adams Fruit*], agricultural employers who pay the cost of workers' compensation for farmworkers are not receiving the protection from lawsuits that all other employers providing workers' compensation receive. The legislation I am introducing today would reverse the effects of the *Adams Fruit* decision and restore the exclusivity of workers' compensation.

141 Cong.Rec. S15234 (daily ed. Oct. 17, 1995).

As reflected in the remarks quoted above, Congress' express intent in passing the 1995 workers' compensation exclusivity amendment to the AWPA was to "reverse" *Adams Fruit*. In this vein, a central theme contained in the remarks of H.R. 1715's sponsors and supporters is that the *Adams Fruit* decision created a manifestly unfair regime for the Nation's agricultural employers, who unlike any other class of employer, were now in essence exposed to double liability— first in the form of contributions to State workers' compensation systems and second in the form of exposure to damages suits brought under the AWPA. Remedying this perceived unfairness so as to afford agricultural employers the same protection against damages actions as is enjoyed by all other employers who contribute to the workers' compensation system is unquestionably a le-

gitimate legislative end. *Cf. United States v. Sperry Corp.*, 493 U.S. 52, 64–65, 110 S.Ct. 387, 396–397, 107 L.Ed.2d 290 (proper for Congress to legislate retrospectively to ensure that costs of international arbitral tribunal are borne in like manner by all successful claimants before the tribunal); and enacting legislation designed to give full effect to the quid pro quo balance struck by State workers' compensation legislation is equally a legitimate legislative end. *Cf. General Motors Corp. v. Romein*, 503 U.S. 181, 191, 112 S.Ct. 1105, 1111–1112, 117 L.Ed.2d 328 (proper for the Michigan Legislature to legislate retroactively to, among other things, preserve—in the wake of an unexpected Michigan Supreme Court decision—legislative compromise accomplished by previous workers' compensation legislation). Making the 1995 exclusivity amendment retroactive to pending cases rationally furthered both of these interrelated ends. By making the exclusivity amendment applicable to all pending cases (as opposed to making the amendment applicable only prospectively to actions arising after the date of enactment), Congress maximized the effect of this remedial legislation and minimized the effect of *Adams Fruit.* There is nothing arbitrary or irrational in this effort to minimize the effect of what was perceived to be an improper construction of the AWPA by the Supreme Court in *Adams Fruit.* Because retroactive application of the workers' compensation exclusivity provision in the 1995 AWPA amendments is rationally related to a legitimate legislative purpose, such retroactivity does not offend due process and the district court correctly decided that Deck's claim under the Act would be barred if PRSI was found to be Calderon's employer at the time of his death.

*AWPA's Scope of Coverage*

■ The second prong of the district court's decision concluded that if PRSI was found not to be Calderon's employer at the time of his death, he would have no claim against PRSI under the Act. We turn now to consider whether the AWPA encompasses suits brought by migrant workers against agricultural employers other than their own employers at the time of an accident.[9] Our point of departure is the Act's private right of action provision, which states, in pertinent part, as follows:

> Any person aggrieved by a violation of this chapter or any regulation under this chapter by a farm labor contractor, agricultural employer, agricultural association, or other person may file suit in any district court of the United States....

29 U.S.C. § 1854(a). As is evident from the quoted language, the private right of action provision contains no language limiting the class of potential "agricultural employer" defendants to employers of the aggrieved person. Rather, the Act creates a private right of action for any person aggrieved by a violation of the Act (or accompanying regulations) by *an* agricultural employer. In turn, the Act defines the term "agricultural employer" as "any person who owns or operates a farm ... or nursery ... and who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(2). On its face, the definition of "agricultural employer" extends well beyond the class of persons who actually "employ" migrant or seasonal workers and encompasses, as well, persons who recruit, solicit, furnish, or transport such workers. Moreover, the Education and Labor Committee's report, which accompanied the release of the Act out of Committee, emphasizes that "[t]he use of the word 'or' in the phrase 'recruits, solicits, hires, employs, furnishes, or transports' is intended by the committee to mean any one or all of the activities listed." H.R.Rep.No. 97–885 at 5 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4547, 4551. Thus there can be no doubt that by engaging in such activities as recruiting, soliciting, furnishing or transporting a migrant worker, one could be deemed an "agricultural employer" subject to suit under the Act regardless of whether the plaintiff was employed by the "employer." Accordingly, whether an agricultural employer was an aggrieved person's employer is immaterial for

---

**9.** Our discussion is limited, of course, to suits alleging violations of the Act's motor vehicle safe- ty provision.

purposes of determining whether the Act provides for a cause of action by the aggrieved person against that agricultural employer.

■ This conclusion is bolstered when, in addition to examining the Act's general provisions defining "agricultural employer" and establishing a private right of action, its motor vehicle safety provisions are reviewed. These provisions, set out at 29 U.S.C. § 1841(b), state:

> When using, or causing to be used, any vehicle for providing transportation ..., *each* agricultural employer ... shall—
>
> (A) ensure that such vehicle conforms to the standards prescribed by the Secretary ... and other applicable Federal and State safety standards,
>
> (B) ensure that each driver has a valid and appropriate license, as provided by State law, to operate the vehicle .... (emphasis added) [10]

The standards prescribed by the Secretary of Labor note that: "When *any* person not otherwise exempt from the Act recruits, solicits, hires, employs, furnishes or transports workers, that person is required to comply with the applicable protective provisions of the Act," 29 C.F.R. § 500.70(a) (emphasis added); and, "Responsibility for compliance with the motor vehicle safety and insurance provisions of section 401 of the Act and §§ 500.100 through 500.128 of these regulations is imposed upon the person or persons using or causing to be used, any vehicle for transportation of migrant or seasonal agricultural workers." 29 C.F.R. § 500.70(c). It is impossible to reconcile this language with defendant's contention that "the transportation requirement at issue here, 29 U.S.C. § 1841(b)(1), requires the existence of an employment relationship in order for plaintiff to recover under the AWPA." Appellee's Brief at 6. To the contrary, the statute and regu-

lations make clear that any agricultural employer that uses or causes to be used a vehicle for the transportation of migrant workers is required to comply with the requirements of the Act.

Defendant's reliance on *Ricketts v. Vann,* 32 F.3d 71 (4th Cir.1994), and *Barrientos v. Taylor,* 917 F.Supp. 375 (E.D.N.C.1996), is entirely unavailing. In *Ricketts,* the Fourth Circuit affirmed the district court's grant of summary judgment in favor of two defendants alleged to have violated the motor vehicle safety provisions of the Act. Neither of those defendants recruited, solicited, hired, employed, furnished or transported migrant workers; hence neither could be deemed an "agricultural employer" under the Act. *Ricketts,* 32 F.3d at 76–77. Thus the holding in *Ricketts* establishes no more than that the Act creates a cause of action only against "agricultural employers." Nowhere does the *Ricketts* opinion hold or even suggest that an employment relationship between the aggrieved person and the agricultural employer is required in order for the employer to be held liable for violations of the Act. In the present action, it is undisputed that PRSI is an "agricultural employer" as defined by the Act. Although the district court in *Barrientos* asserted that liability for violation of the Act's motor vehicle safety provisions "requires that defendants have an employment relationship with plaintiffs," 917 F.Supp. at 380, the only authority cited by the court for that assertion is *Ricketts,* which, as explained above, simply does not support the proposition. In short, *Barrientos* misread *Ricketts.*

In sum, we hold that a person aggrieved by an "agricultural employer's" violation of the motor vehicle safety requirements of the AWPA may assert a private right of action against that employer irrespective of whether an employment relationship existed between the two. Accordingly, the district

---

10. The regulations promulgated under the Act echo this language:

> Each farm labor contractor, agricultural employer and agricultural association which uses, or causes to be used, any vehicle to transport a migrant or seasonal agricultural worker shall ensure that such vehicle conforms to vehicle safety standards prescribed by the Secretary of Labor under the Act and with other applicable

Federal and State safety standards. Each farm labor contractor, agricultural employer and agricultural association shall also ensure that each driver of any such vehicle has a currently valid motor vehicle operator's permit or license, as provided by applicable State law, to operate the vehicle.

29 C.F.R. § 500.100(a).

court erred in concluding that if PRSI were found not to be Calderon's employer, it would be free of any liability under the Act. Of course, it remains to be seen whether Calderon can prevail in his AWPA claim against PRSI. First, the district court must decide the issue of whether or not Calderon was employed by PRSI. If he was, the workers' compensation exclusivity provision will bar this suit. However, assuming *arguendo* that PRSI is found not to have been Calderon's employer—a position PRSI has steadfastly maintained throughout this litigation—rendering the workers' compensation exclusivity provision inapplicable, Deck must still establish that PRSI used, or caused the Kankakee Valley truck to be used, to transport Calderon on the day in question and that by so doing PRSI caused Calderon's death. These are all factual issues that remain to be resolved below.

For the foregoing reasons, the judgment of the district court is reversed and remanded for further proceedings.